UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                   :
SHAWN MONAE COLBERT,
                                                   :        OPINION AND ORDER
                    Plaintiff,                              17 Civ. 5172 (GWG)
                                                   :
              -v.-
                                                   :
COMMISSIONER OF SOCIAL SECURITY
                                                   :
                    Defendant.
---------------------------------------------------------------X
GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

       Plaintiff Shawn Monae Colbert brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for disability benefits under the Social Security Act (the "Act"). Both parties

have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1]

For the reasons stated below, Colbert's motion is denied and the Commissioner's motion is

granted.

I. BACKGROUND

       A. Procedural History

       Colbert applied for Supplemental Security Income ("SSI") on January 7, 2014. See

Certified Administrative Record, filed Oct. 30, 2017 (Docket # 12) ("R."), at 210-18. The Social

Security Administration ("SSA") denied Colbert's application and Colbert sought review by an

---

       [1] Notice of Motion, filed Dec. 21, 2017 (Docket # 14); Memorandum of Law in Support
of the Plaintiff's Motion for Judgment on the Pleadings, filed Dec. 21, 2017 (Docket # 15) ("Pl.
Mem."); Notice of Cross-Motion, filed Mar. 2, 2018 (Docket # 18); Memorandum of Law in
Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition
to Plaintiff's Motion for Judgment on the Pleadings, filed Mar. 2, 2018 (Docket # 19) ("Comm'r
Mem.").

Administrative Law Judge ("ALJ").  R. 102-08.  A video hearing was held on January 20, 2016,

before ALJ Jack Russak.  R. 55-88.  In a written decision dated February 1, 2016, the ALJ found

Colbert not disabled within the meaning of the Act.  R. 16-38.  On May 12, 2017, the Appeals

Council denied Colbert's request for review of the ALJ's decision, making the ALJ's decision

the final decision of the Commissioner.  R. 1-6.  This action followed.

B. <u>The Hearing Before the ALJ</u>

Colbert was represented by attorney David E. Levine at the January 20, 2016 hearing

before the ALJ.  R. 55.

Colbert testified to having psychiatric issues, alcohol and substance use disorders, and

problems in her left knee caused by a torn meniscus.  R. 60, 79.  At the time of the hearing, she

was seeing a psychiatrist once a month, having started in late 2012 or early 2013.  R. 69.  She

also attended therapy once a week.  R. 69.  She said that she was currently taking psychiatric

medication and blood pressure medication, which caused her to "sleep a lot" and increased her

appetite.  R. 70.  She explained that one of the side effects of the medication she was taking is

weight gain.  R. 61-62.  She said the medication helps "because [she] do[es]n't hear the voices

that [she] was hearing before as much."  R. 70.  Those voices would tell her to "just drink and

just go ahead and get high," and to "just give up" because "[y]ou're never going to see your kids

again."  R. 75.  She also testified to having concentration problems.  R. 75.  As for her knees, she

explained that while she had undergone surgery on her knee, it was not successful: "I can't even

move it [now]," and "[s]ometimes it clicks and I can't do nothing with it."  R. 77.  She also now

"get[s] a lot of cramps in the knee," more than before.  R. 77.

Her knee problems limit her daily activities.  In addition to using a cane which she was

prescribed, she "can't get in the tub, in and out," R. 63, and can generally walk only "a half a

block," before stopping to catch her breath, R. 71. She has no problems dressing herself and taking a shower, however. R. 63-64. She said that she does not have any limitations in sitting, except that "[i]f [she] sit[s] long enough, [she]'ll fall asleep," R. 71, but later explained that she also needs to have her legs elevated when she sits, R. 78. She "can't stand at all because [her] lower back will start hurting . . . [her] knee will start hurting," and "so [she] can't stand" for long at all. R. 71. For example, she cannot clean the apartment and so a friend will sometimes "sweep and mop the floor" for her. R. 72. She must sit down to "prep [her] food" when cooking, and after she has placed her food on the stove, she needs to "go sit down and come back to it [later]." R. 71-72. Despite these limitations, she does her own grocery shopping, "because the supermarket is not far" and she can take "[her] shopping cart with [her]." R. 72. She traveled to the hearing by bus and alone. R. 63-64.

When not performing routine household activities, she attends church, watches TV and movies, and sometimes reads the Bible. R. 65. She said that she attends church every Sunday and occasionally on Wednesday for Bible study, taking two buses to get there, but also later acknowledged that she sometimes stays home because she dislikes certain other parishioners at the church. R. 64, 76. She does not make social calls to friends or relatives. R. 65, 72. She was married for 19 years, but it was a violent marriage and they divorced in 2010. R. 62-63. She has 15 children, but none of them are living with her at the moment and she does not see them. R. 64. Although she testified that a friend will visit her "maybe . . . once a week" from New Jersey, she also explained that "[s]he just comes and checks in on me," meaning that she'll ask "how you're doing, you're okay, you need me to do anything for you"? R. 73-75. As for how she spends her time, she said that she spends most days praying, watching TV, and eating. R. 73. She does not have access to a computer or a cell phone. R. 65-66. She survives off of food

3

stamps and public assistance. R. 66.

At the time of the hearing, Colbert was 48 years old. R. 61. She had not previously worked, except a few months in 2010 "[braiding] people's hair that [would] come to [her] house, . . . [so that they] give [her] a couple of dollars." R. 58, 67. She stopped because "[t]here was nobody else's hair to do." R. 58. Before 2012, she was addicted to alcohol and cocaine, but has not used either since 2012. R. 73-74. She has obtained her GED and, while in recovery for drug addiction, completed a course to become a substance abuse counselor. R. 66-67.

A vocational expert ("VE"), Melissa Fass-Karlin, provided her opinion on Colbert's vocational capacity. R. 80-85. She described Colbert's past work as that of a hair stylist, demanding "light" exertion with a skill level of 6. R. 81. The ALJ asked Fass-Karlin whether a person of Colbert's age, education, and work experience could perform any work in the national economy if he or she was limited to sedentary work and could

> climb ramps and stairs occasional[ly]; never climb ladders, ropes, [or] scaffolds; occasionally stoop, crouch, and kneel, but never crawl; [was] limited to jobs that can be performed by using a handheld assistive device required only for uneven terrain or prolonged ambulation. Nonexertional limitations will be the following: work is limited to simple, routine tasks; work in a low-stressed job defined as having only occasional decision-making, [and] only occasional changes in the work setting; work off task five percent of the day in addition to regular[ly] scheduled breaks; work with only occasional judgment required on the job, and finally no interaction with the public, [and] . . . occasional interaction with coworkers

R. 81-82. The VE testified that such a person could not perform the work of a hairstylist, but could work as "a bench hand," "addresser," and "document preparer." R. 83-84.

C. The Medical Evidence

Both Colbert and the Commissioner have provided summaries of the medical evidence contained in the administrative record. See Pl. Mem. at 2-8; Comm'r Mem. at 2-10. The

summaries are substantially consistent with each other.  The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Nov. 1, 2017 (Docket # 13), ¶ 5, and neither party has done so.  Accordingly, the Court adopts Colbert's and the Commissioner's summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in section III below.

    D.  The ALJ's Decision

The ALJ denied Colbert's application for SSI on February 1, 2016.  R. 16.  Following the five-step test set forth in SSA regulations, the ALJ found at step one that Colbert had not engaged in "substantial gainful activity" since January 7, 2014, which was the date on which she applied for benefits.  R. 21.  At step two, the ALJ found that Colbert had the following severe impairments: "status post left knee arthroscopic surgery, pseudo brain tumor, hypertension, obesity, depressive disorder, and alcohol and crack cocaine dependence in remission."  Id.

At step three, the ALJ concluded that none of Colbert's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 22-24.  In reaching this conclusion, the ALJ considered Listing 1.02, Major Dysfunction of a Joint; Listing 4.00, Cardiovascular System; Listing 12.04, Affective Disorders; and Listing 12.09, Substance Addiction Disorder.  See 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 4.00, 12.04, 12.09.  The ALJ determined that Listing 1.02 was not met because the record evidence did not "demonstrate the requisite gross anatomical deformity with evidence of joint space narrowing, bony destruction, or ankylosis, resulting in inability to ambulate effectively."  R. 22.  Evidence in the record was similarly lacking to show any of the requirements to meet or medically equal Listing 4.00.  Id.

As for Listings 12.04 and 12.09, the ALJ found that Colbert did not meet any of the "paragraph B" criteria.[2]  R. 22-23.  She was only mildly restricted in her activities of daily living, moderately restricted in her social functioning, concentration, and persistence or pace, and had not experienced any episodes of decompensation.  Id.  The record also did not substantiate a claim that she met the "paragraph C" criteria, according to the ALJ.  R. 23-24.  Specifically, the ALJ found no evidence that Colbert suffered from "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate," or a recent history of lengthy inability "to function outside a highly supportive living arrangement."  Id.

---

[2]  To meet Listings 12.04 or 12.09, an SSA applicant must meet the "paragraph B" or "paragraph C" criteria for each listing.  For paragraph B, an applicant must meet two of the following criteria:

> [m]arked restriction of activities of daily living; or [m]arked difficulties in maintaining social functioning; or [m]arked difficulties in maintaining concentration, persistence, or pace; or [r]epeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.09(B).  Marked "means more than moderate but less than extreme," or "such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  Id. § 12.00(C).  Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning," manifested by difficulties with the first three categories.  Id.

The SSA modified Listing §§ 12.04 and 12.09 in 2016, but the modifications did not go into effect until January 2017 and the implementing regulations state that the SSA will "apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date."  See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138 (Sept. 26, 2016) (to be codified at 20 C.F.R. pt. 404).  The notice states that the SSA "expect[s] that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."  Id. at 66,138 n.1.  Because Colbert applied in 2014 and had her claim decided in 2016, R. 1-4, 16, 89, the modifications do not apply to her case.

Having found that Colbert could not meet Listings 1.02, 4.00, 12.04, or 12.09, the ALJ

next assessed Colbert's residual functional capacity ("RFC"). R. 24-31. Upon review of the

record, the ALJ found that Colbert

> has the residual functional capacity to perform sedentary work as defined in 20
> CFR 416.967(a) except she can only occasionally climb ramps and stairs, and
> never climb ladders, ropes, or scaffolds. She can occasionally stoop, crouch,
> kneel and never crawl. The claimant is limited to work that can be performed
> while utilizing a hand-held assistive device required for uneven terrain or
> prolonged ambulation. She could tolerate no exposure to moving machinery,
> unprotected heights, or driving motor vehicles. The claimant was limited to
> performing simple, routine tasks in a low-stress job, defined as requiring only
> occasional decision-making and judgment, and involving only occasional changes
> in the work setting, and occasional interaction with the public and coworkers. In
> addition, she is limited to work at a job allowing her to be off-task for 5% of the
> workday.

R. 24. In finding this RFC, the ALJ relied heavily on the medical notes and observations of

Colbert's various treating and examining physicians, R. 26-31, giving "great weight" to the

opinions of treating psychiatrist Dr. Tarsha Hunter, consultative psychiatric examiner Dr.

Haruyo Fujiwaki, and consultative internal medicine examiner Dr. Vinod Thukral, R. 30-31.

The ALJ awarded "little weight" to the opinion of treating psychiatrist Dr. Michael Hargrove,

who found marked limitations in most functional areas, because the ALJ found his opinion "in

stark contrast with, and far more restrictive than the evidence of record, including Dr.

Hargrove's own treating records," as well as Dr. Hargrove's assessed GAF score of 55.[3] R. 31.

---

[3] A GAF, or "global assessment of functioning," score "is a scale promulgated by the
American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with
psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir.
2008) (alterations in original) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual
of Mental Disorders ("DSM") 32 (4th ed. 2000)). "A GAF between 51 and 60 indicates
'[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with
peers or co-workers).'" Id. (quoting Am. Psychiatric Ass'n, supra, at 34). "GAF scores may be
relevant to an ALJ's severity and RFC determinations, although they are intended to be used to

It also "does not adequately consider [Colbert's] own reported retained mental capacity to perform tasks [related to paragraph B criteria for a psychiatric disorder listing]." R. 31.

At step four, the ALJ found that Colbert could no longer work as a hair stylist, finding that job exceeded her RFC. R. 32. At step five, because the ALJ found that Colbert's RFC was less than the performance requirements for sedentary work under the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ relied on the VE's testimony at the hearing. R. 32-33. At the hearing, the VE had testified that a hypothetical person with Colbert's RFC, age, work experience, education, and limitations could perform the jobs of "bench hand, addresser, and document preparer." R. 33. Based on that testimony, which the ALJ found credible and reliable, the ALJ concluded that Colbert was "capable of making a successful adjustment to other work . . . in the national economy," and accordingly was not disabled under the Act. Id.

II. GOVERNING STANDARDS OF LAW

A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

_____

make treatment decisions . . . and not disability determinations." Gonzalez v. Colvin, 2016 WL 4009532, at *5 (W.D.N.Y. July 27, 2016) (alteration in original) (internal quotation marks and citation omitted). As reflected in the Fifth Edition of the DSM, published in 2013, the GAF scale is "no longer in use." Kaczkowski v. Colvin, 2016 WL 5922768, at *12 (S.D.N.Y. Oct. 11, 2016).

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134

F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." Id. § 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  See id. § 416.920(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. § 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  Id. § 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

 C. The "Treating Source" Rule

 In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled.  See 20 C.F.R. § 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 416.927(c)(2).  An ALJ must accord "controlling

weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which are (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. § 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 416.927(c)(2)-(6)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from

ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.

## III. DISCUSSION

Colbert's brief seeking remand appears to raise three grounds: (1) the ALJ should have found that she met Listing 12.04, Pl. Mem. at 10; (2) the ALJ did not consider the side effects of Colbert's medications in compiling her RFC, id. at 16; and (3) the ALJ did not incorporate limitations resulting from Colbert's tenosynovitis, pseudo tumor, and glaucoma into the RFC, id. We discuss each next.

### A. Listing 12.04 Determination

At step three, the ALJ found Colbert did not meet any of the "paragraph B" criteria. R. 22-23. In the area of activities of daily living, the ALJ concluded that Colbert was mildly restricted, noting that she sometimes had trouble sleeping but otherwise has no "psychological barriers to performing her personal hygiene tasks," does "her own laundry, clean[s] her home, travel[s] independently via public transportation, and shop[s] in stores for toiletries, and snacks." R. 22. In the area of social functioning, the ALJ recognized that Colbert suffered more severe restrictions, finding that she has moderate difficulties as she does "not spend time with others," "isolate[s] herself when she [is] depressed," and experiences anxiety when contemplating a decision. R. 23. However, these challenges did not rise to the level of "marked," because in the ALJ's view of the record, "she denied [in February and April 2014] having any problems getting along with other people, including those in authority, and she had never lost a job because of problems getting along with others." Id. She also regularly attended church and group therapy, and was able to travel on public transportation and shop in stores. R. 23. The ALJ found that Colbert endured similarly moderate difficulties with concentration, persistence, and pace,

13

acknowledging that "she reported problems paying attention, stating she sometimes drifted away in thought, and she was learning how to finish what she started," in addition to sleep difficulties. Id. But the ALJ also found that she could "follow both written and [oral] instructions," and "no longer had trouble remembering things." Id. She also now "just go[es] with the flow," instead of experiencing frustration with stress and change. Id. The record contained no evidence of any episode of decompensation. Id.

Colbert's challenges to the ALJ's step three finding rest largely on the ALJ's application of the treating source rule to the opinions of Dr. Hargrove and Dr. Fujiwaki. See Pl. Mem. at 10-15. We discuss that issue and then address other arguments made by plaintiff.

1. Application of the Treating Source Rule

Colbert argues that the ALJ "should have given deference to the opinion of Ms. Colbert's treating psychiatrist [Dr. Hargrove]." Pl. Mem. at 10. Dr. Hargrove had filled out a "Medical Source Statement" on April 30, 2015, R. 699-703, indicating that Colbert had marked limitations in all areas related to her "ability to understand, remember, and carry out instructions," her "ability to respond appropriately to supervision, coworkers and work pressure in a work-setting," her activities of daily living, and her social functioning. R. 701-02. Dr. Hargrove also opined that Colbert had "frequent" deficiencies of concentration, persistence, or pace and "continual" episodes of deterioration. R. 702. Such limitations were reportedly unchanged and persistent from the 1990s through to the 2015 evaluation. R. 703. The opinion also reported that Colbert's highest GAF score in the past year was 55, which was also her score at the time of the examination. R. 699. Had the ALJ deferred to this opinion, as Colbert desires, it plainly would have resulted in a finding of disability at step three.

As stated earlier, the ALJ gave this opinion "little weight," finding it "in stark contrast

to" Dr. Hargrove's own notes, the record as a whole, the reported GAF score, and Colbert's "own reported retained mental capacity." R. 31. Such reasons, if supported by substantial evidence, qualify as legally valid reasons to not give controlling weight to a treating source's opinion under SSA regulations, 20 C.F.R. § 416.927(c)(2), and "good reasons" under case law and regulations for giving little weight to a treating source's opinion, see generally Greek, 802 F.3d at 375 (an ALJ may give less weight to a treating source's opinion after considering "the amount of medical evidence supporting the opinion . . . [and] the consistency of the opinion with the remaining medical evidence"); Halloran, 362 F.3d at 32-33 (stating that the Second Circuit will remand "opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion," i.e., good reasons that "let[] claimants understand the disposition of their cases" and facilitate judicial review) (citations and internal quotation marks omitted); see also 20 C.F.R. § 416.927(c)(3)-(4) (among factors used to evaluate weight of treating source opinion is the extent to which the opinion is supported by medical signs and laboratory findings and is consistent with the record as a whole). An ALJ need not accept a treating source opinion that "conflicts with other substantial evidence in the record." Halloran, 362 F.3d at 32; see also Pl. Mem. at 10-11 (citing 20 C.F.R. § 416.927(c)(2), Burgess, 537 F.3d at 128, and Calzada v. Astrue, 753 F. Supp. 2d 250, 276 (S.D.N.Y. 2010), for principle that treating sources are deferred to where "well-supported by medical findings and [] not inconsistent with the other evidence in the record"). This is because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." Veino, 312 F.3d at 588.

We agree with Colbert's argument, see Pl. Mem. at 14, that the governing regulations accord more weight to a treating source that provides a "longitudinal picture" of a claimant's impairment. 20 C.F.R. § 416.927(c)(2). One case cited by Colbert, Canales v. Commissioner of

Social Security, 698 F. Supp. 2d 335 (E.D.N.Y. 2010), does indeed overturn an ALJ's decision to reject a treating source's opinion on the functional limitations of the claimant's mental impairments.  Id. at 343-44.  In that case, however, the Court determined that the ALJ's stated reasons were insufficiently developed for review and therefore it ordered the ALJ to further "develop the record on this issue on remand."  Id. at 343.  It did not base its decision on the length of the treating relationship.  The other case cited by Colbert, Rodriguez v. Astrue, 2009 WL 637154 (S.D.N.Y. Mar. 9, 2009), concerned an ALJ's reliance on the opinions of a non-examining state agency medical consultant instead of treating physicians who made contrary findings.  Id. at *23-25.  Rodriguez reasoned that the treating sources' opinions merited great weight, in part, "[b]ecause the findings of the treating and examining physicians were consistent with each other" while the non-examining physician's opinions "were largely inconsistent with the examining physicians' findings."  Id. at *26.

Here, the ALJ properly gave little weight to Dr. Hargrove's opinion of Colbert's functional limitations.

First, although Dr. Hargrove opined that Colbert was markedly impaired in all functional areas, going back to the 1990s, his reported GAF score of 55 at the time of that evaluation, R. 699, as well as at an October 2013 examination, R. 652, contradicts these findings because, as noted by the ALJ, R. 31, this score indicates only moderate symptoms.  See Kohler, 546 F.3d at 262 n.1 ("A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'") (alteration in original) (citation omitted).  Indeed, at about that same time as the October 2013 examination, Colbert was assessed with a GAF score of 68 by Dr. Hunter, indicating only mild symptoms.  R.

481; see Maldonado v. Colvin, 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017) ("a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally functioning 'pretty well'") (citation omitted).

Second, the ALJ correctly noted that Dr. Hargrove's opinion is inconsistent with his own treating notes. Specifically, at an October 2013 examination, Dr. Hargrove had stated that Colbert was "calm and cooperative"; that her "speech is coherent, relevant, [and] goal directed"; and that she exhibited "no formal thought process disorder" and denied "[audio-visual] hallucinations and [suicidal] ideations." R. 651. He also observed that her "memory and cognition are [within normal limits], . . . judgment and insight are adequate, [and] reality testing good." Id. Colbert also had reported to Dr. Hargrove that she did not at the time "feel[] anxious or depressed," nor was she experiencing sleep or appetite issues. R. 650. His office notes from the October 2013 examination also indicated that he thought that no maintenance therapy was necessary and accordingly no return appointment should be made. R. 653.

Third, although Dr. Hargrove treated Colbert starting only in 2013 through 2015, he still opined that her functional limitations had begun in the 1990s and had continued through to the date he filled out the evaluation form. R. 703. Given the lack of support for the opinion that "marked" limitations existed for this lengthy period, the ALJ was correct to note it as a factor for giving less weight to the opinion overall.

Fourth, Dr. Hargrove's opinion, as noted by the ALJ, R. 31, was contradicted by the opinions and treating notes of three other psychiatrists. Dr. Hunter, in February 2013, noted that Colbert was "well-groomed, cooperative," had "normal" speech, "full" affect, "linear" thought processes, good "insight [and] judgment," and reported that Colbert "found talk therapy/church to be helpful — didn't need meds after that." R. 479-80. Dr. Fujiwaki observed at an April

2014 examination that Colbert's "manner of relating, social skills, and overall presentation was adequate," that her attention and concentration were only "mildly impaired," as were her recent and remote memory skills.  R. 630-31.  Dr. Fujiwaki also opined that Colbert could "follow and understand simple directions and instructions, [] perform simple tasks independently[, and] . . . [was] able to maintain a regular schedule in a structured and supportive environment[,] . . . [but was] moderately impaired in relating adequately with others, and appropriately dealing with stress."  R. 631.  Last, Dr. James Herivaux, a treating physician, noted at an October 2015 examination that Colbert had shown improvement over the last year, "feel[ing] more relieved since she has more support."  R. 729.  In recording largely normal observations and improvement, these notes support the ALJ's assertion that Dr. Hargrove's opinion was "in stark contrast with . . . the evidence of record."  R. 31.

Fifth, despite Dr. Hargrove's opinion that Colbert had marked limitations in her ability to perform daily activities and to function socially, the record shows that Colbert was able to attend weekly therapy sessions, as well as monthly collateral and family therapy, on a consistent basis.  See R. 648 ("her attendance has been highly consistent"), 729 ("[Colbert] has been attending her weekly session and has been compliant with meds. . . . [She] complet[ed] the inpatient substance abuse treatment program.  She has also completed the outpatient substance abuse program as well.").  She also completed a 5-month outpatient program at United Bronx Parents, R. 727, and testified at the 2016 hearing to attending church on a regular basis, taking the bus independently, shopping, reading the Bible daily, doing her own laundry, and cooking, R. 63-65, 71-72, 76.  Thus, substantial evidence supported the ALJ's finding that Dr. Hargrove's opinion did "not adequately consider [Colbert's] own reported retained mental capacity to perform tasks such as activities of daily living, function socially, and maintain her concentration, persistence, and pace

18

despite her severe mental impairments." R. 31.

Colbert points to several facts in the record that she argues "lend [] more credibility to Dr. Hargove's opinion," Pl. Mem. at 12, and that in her view undermine the ALJ's reasoning, id. at 15. In considering Colbert's arguments, we emphasize that the issue before us is not whether there exists substantial evidence to support Colbert's position but rather whether there exists substantial evidence to support the ALJ's determination. Genier, 606 F.3d at 49. Colbert notes that the Administration for Children's Services ("ACS") took away all of her children, including her most recent child who was removed from her in January 2013, see R. 310, 650, stating that this is consistent with a finding that she has "marked limitations in social functioning," Pl. Mem. at 12 (citing R. 310, 650), and "that her ability to make appropriate decisions was extremely limited," id. at 13. We reject this argument because these incidents took place prior to her disability onset date of January 28, 2014, see R. 21, Pl. Mem. at 1, over the course of many years, see R. 310, and thus they do not speak directly to her ability to function socially and maintain relationships during the relevant time frame of analysis — that is, the time between her alleged disability onset date (January 28, 2014) and the date of the ALJ's decision (February 1, 2016).[4] See, e.g., Provisero v. Colvin, 2016 WL 4186980, at *2 (E.D.N.Y. Aug. 8, 2016); Davis v. Colvin, 2016 WL 368009, at *1 (W.D.N.Y. Feb. 1, 2016). Colbert herself admitted that she had been addicted to alcohol and cocaine "[f]or years" prior to 2012. R. 73-74. Indeed, there are extensive records showing treatment for substance abuse, R. 278-89,

---

[4] We also note that contrary to Colbert's characterization of the ALJ's decision, Pl. Mem. at 12-13, the ALJ took note of Colbert's testimony as to her lack of involvement with her children, R. 25. In the opinion where Colbert asserts that the ALJ notes that "she socialized with her family," Pl. Mem. at 12 (citing R. 30), the ALJ was in fact summarizing the opinion of a consultative psychiatric examination.

305-12, 477-91, including a record that a fetus she was carrying was exposed to cocaine and alcohol, R. 306. Thus, that Colbert's children were taken from her does not suggest that the ALJ's assessment of her social functioning was not supported by substantial evidence.

Colbert argues that increases in the dosage of her prescribed medications show that she continued to experience auditory hallucinations and depression during the relevant time period, undermining the ALJ's assertion that Colbert improved with medication. Pl. Mem. at 15 (citing R. 729). But Dr. Herivaux's records in October 2015 indicate that Colbert "[o]ver the past year . . . [has] shown improvement, she feels more relieved since she has more support." R. 729. These notes provide no support to Dr. Hargrove's opinion from earlier in that year which opined that Colbert had marked limitations since the 1990s. Colbert argues that it is categorically improper for an ALJ to employ a physician's remarks on a patient's improvement where the physician also increases the patient's medication. Pl. Mem. at 15. But the case cited, Burton-Mann v. Colvin, 2016 WL 4367973 (S.D.N.Y. Aug. 13, 2016), does not support this conclusion. Rather, it stands for the more limited principle that a person with a chronic disease should not be judged to have improved merely because of stray "hopeful remarks" in a record that otherwise suggests ongoing distress. Id. at *6. In that case, the ALJ omitted any mention of information contained in a treating source's notes that corroborated the source's opinion, including that "the plaintiff's current dosage of medication was increased," while seizing upon "'hopeful remarks' about a plaintiff's improvement to conclude that little weight [was] due to a treating source." Id. Here, by contrast, the ALJ accurately described Dr. Herivaux and Dr. Hargrove's notes, including Dr. Herivaux's "recommended adjustment of [Colbert's] medication and continuation of psychotherapy." R. 29-30. Nonetheless, the ALJ found evidence suggesting that Colbert's symptoms had improved with consistent use of medication, including her own testimony at the

hearing.  R. 70.  Thus, the increase in Colbert's medication regimen does not render the ALJ's opinion unsupported by substantial evidence.

Colbert also argues that too much deference was given to the opinion of consulting psychiatrist Dr. Fujiwaki.  Pl. Mem. at 13.  Specifically, Colbert claims it was error to give great weight to Dr. Fujiwaki's opinion because Dr. Fujiwaki examined Colbert only once, the opinion preceded Dr. Hargrove's by a year, the opinion contradicted Dr. Hargrove's opinion, and the involvement of ACS in Colbert's relationship with her children suggested much more severe limitations than Dr. Fujiwaki found.  Id.  We have already considered and rejected the last point. As to the others, it is well-settled that a consulting psychiatric examiner's opinion may be given great weight and may constitute substantial evidence to support a decision.  See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) (finding no error in ALJ's reliance on "[t]he opinions of three examining physicians, plaintiff's own testimony, and [certain] medical tests"); accord Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order) (consultative examiner's opinion constitutes substantial evidence supporting ALJ's decision to accord little weight to treating source); Monroe v. Comm'r of Soc. Sec., 2016 WL 7971330, at *8 (N.D.N.Y. Dec. 29, 2016) ("[T]he Second Circuit has made it clear that the opinions of State agency medical consultants . . . may constitute substantial evidence to support an ALJ's RFC determination."); Mayor v. Colvin, 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015) ("It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions") (citing cases).  It is also generally accepted that a consultative examiner's opinion may be accorded greater weight than a treating source's opinion where the ALJ finds it more consistent with the medical evidence.  See Diaz, 59 F.3d at 313 n.5 ("[T]he opinions of nonexamining sources [can] override treating source's opinions provided they are supported by evidence in the

record."); accord Suttles v. Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (no error by ALJ to give great weight to consultative examiner's opinion because it was consistent with record evidence); Mayor, 2015 WL 9166119, at *18 ("An ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence."); Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (same).  The ALJ determined that Dr. Fujiwaki's opinion merited great weight because "it [was] supported by the evidence of record as a whole, which demonstrates depressive disorder with persistent symptoms despite the claimant's course of treatment of psychotropic medications and psychotherapy."  R. 30.  It also "adequately considers the claimant's subjective complaints, as well as her own reported retained mental capacity."  Id.  This determination is supported by substantial evidence, as the opinions and notes of Dr. Hunter, R. 479-81, and Dr. Herivaux, R. 729-31, as well as Dr. Hargrove's notes, R. 650-52, support Dr. Fujiwaki's findings that Colbert had depression with persistent symptoms but only mild to moderate restrictions in key functional areas.  It is only Dr. Hargrove's opinion, R. 699-703, that stands out.  Where there is a genuine dispute in the evidence, as there is here, the ALJ does not commit error in resolving it in favor of a consultative examiner's opinion.  Veino, 312 F.3d at 588.  Accordingly, we cannot find that it was error for the ALJ to accord Dr. Fujiwaki's opinion greater weight than Dr. Hargrove's.  Inasmuch as Colbert also raises the relative timing of Dr. Fujiwaki's opinion and the fact that it was the result of one examination, these factors merely go to the weight given an opinion, see 20 C.F.R. § 416.927(c)(2)-(6), and do not render a consulting opinion valueless.  Because Dr. Fujiwaki's opinion was supported by the record evidence and Colbert's testimony, the ALJ did not err in according it great weight.

Colbert alternatively argues that part of Dr. Fujiwaki's opinion "suggests that [Colbert] is unable to [maintain a regular schedule] in a normal work environment," and thus it did not "necessarily" contradict Dr. Hargrove's opinion. Pl. Mem. at 14-15. Specifically, Colbert points to Dr. Fujiwaki's opinion that she "is able to maintain a regular schedule in a structured and supportive environment," contending that the logical opposite is that she could not maintain a regular schedule <u>outside</u> such an environment. <u>Id.</u>[5] Because the ALJ did not rely on this specific finding in discounting Dr. Hargrove's opinion, this point does not bear on the question of whether the ALJ properly gave little weight to Dr. Hargrove's opinion. It also requires speculation. Accordingly, it does not change our view of whether the ALJ could give little weight to Dr. Hargrove's opinion. Thus, Colbert's challenge to the weight given Dr. Fujiwaki's opinion is hereby rejected.

## 2. <u>Alleged Factual Errors in ALJ's Reading of the Record</u>

Colbert argues that the ALJ misinterpreted key facts in reaching a step three conclusion regarding whether Colbert had a listed impairment. Pl. Mem. at 12-14. We reiterate that "[t]he substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>." <u>Brault</u>, 683 F.3d at 448 (emphasis in original) (citation and internal quotation marks omitted); <u>accord</u> <u>Quinones ex rel. Quinones v. Chater</u>, 117 F.3d 29, 36 (2d Cir. 1997) ("Where an administrative record supports disparate

---

[5] Colbert points to "POMS DI 34001.032" for the principle that an ability to complete tasks in a highly structured or supportive setting "does not necessarily demonstrate [a claimant's] ability to complete tasks in the context of regular employment." <u>Id.</u> We note that the POMS guidelines "ha[ve] no legal force, and [they] do[] not bind the [Commissioner]." <u>Schweiker v. Hansen</u>, 450 U.S. 785, 789 (1981); <u>accord</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 775 (2d Cir. 1999). In any event, the POMS guideline quoted makes a statement only on necessity. Here, however, the ALJ did not rely exclusively on Dr. Fujiwaki's opinion in making a step three finding and thus the POMS guideline quoted is irrelevant.

findings, we must accept the ALJ's factual determinations.").

The first factual error that Colbert points to is the ALJ's determination, as part of the ALJ's finding related to how restricted Colbert was in her activities of daily living and her ability to concentrate and persist, that Colbert could clean her own home and do her own laundry.  See R. 22-23.  Colbert contends that her testimony indicates otherwise.  Pl. Mem. at 12.  While we recognize that Colbert testified at the hearing that she does not clean her apartment but rather relies on a friend to sweep and mop, R. 72, 74-75, the ALJ cited correctly to three other portions of the record where Colbert attests to an ability to clean and do her own laundry, see R. 22 (citing R. 253-63, 629-32, 633-37).  Namely, Colbert stated in her "function report," R. 255, that she can clean and do her own laundry, R. 258, except to the extent that cleaning required "moving heavy objects," id.; Dr. Fujiwaki reported that Colbert told him she could clean and do laundry, R. 631; and Dr. Thukral similarly reported that Colbert so stated, R. 634.  Moreover, Colbert's testimony at the hearing suggested that it was her physical impairments that limited her from cleaning, while the issue being addressed by Colbert in her motion is to what degree her psychological impairments restrict her activities of daily living.  On the basis of this record, the ALJ had substantial evidence for his factual conclusion that Colbert could in fact clean and do laundry.

The second factual error Colbert points us too is that the ALJ improperly stated that Colbert "had never lost a job because of problems getting along with others."  See Pl. Mem. at 13-14 (citing R. 23).  As Colbert points out, she in fact has not held a consistent job "since 2000."  Id.  We agree that although technically accurate, the ALJ's assertion was misleading.  Colbert has been unemployed since at least 2000, except for a couple of months of self-employment.  See R. 67, 232, 245.  She has thus had no opportunity to lose a job based on her

ability to get along with others. But we do not view this error as rendering without proper support the ALJ's conclusion that Colbert is only moderately impaired in the area of social functioning. In support of that conclusion, the ALJ also noted that Colbert "denied having any problems getting along with other people," attended "group programming" and church, traveled independently on public transit, and shopped in stores. R. 23. These findings are supported by the record. See R. 67 (attending course to be a substance abuse counselor), 260, 262 (no problems getting along with others), 631 (taking public transit, socializing with family), 648 (attending collateral and family therapy sessions monthly). The ALJ's conclusion is also supported by the opinion of Dr. Fujiwaki who opined that Colbert "is moderately impaired in relating adequately with others, and appropriately dealing with stress." R. 631. We thus conclude that the ALJ's social functioning finding was supported by substantial evidence in the record.

B.  Consideration of the Side Effects of Medication

Colbert contends that the case should be remanded because the ALJ violated Social Security regulations and rulings in not addressing the side effects of her medication. Pl. Mem. at 16. Specifically, she asserts that Social Security regulations require the Commissioner to consider "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. § 416.929(c)(3)(iv). However, those regulations also expressly state:

> statements about your pain or other symptoms will not alone establish that you
> are disabled. There must be objective medical evidence from an acceptable
> medical source that shows you have a medical impairment(s) which could
> reasonably be expected to produce the pain or other symptoms alleged and that,
> when considered with all of the other evidence (including statements about the
> intensity and persistence of your pain or other symptoms which may reasonably
> be accepted as consistent with the medical signs and laboratory findings), would

25

> lead to a conclusion that you are disabled.
>
> . . .
>
> Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) [which could reasonably be expected to produce the pain or other symptoms alleged] is present.

Id. § 416.929(a)-(b).  As explained in SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996),[6] where objective medical evidence does not substantiate claimed symptoms, such as side effects, the ALJ must determine the credibility of the claimant's statement based on the factors listed in 20 C.F.R. § 416.929(c)(3).  1996 WL 374186, at *4; accord Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order).  These factors include side effects, but they also include daily activities, reported pain or other symptoms, "precipitating and aggravating factors," treatment besides medication, coping measures the claimant uses, and "[o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. § 416.929(c)(3)(i)-(vii).  The ALJ is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as "the evidence of record permits us to glean the rationale of an ALJ's decision."  Cichocki, 534 F. App'x at 76 (quoting Mongeur, 722 F.2d at 1040).

Here, the ALJ satisfied his obligations under the regulations to consider Colbert's testimony about her symptoms, including side effects.  The ALJ correctly summarized the claimant's testimony at the hearing, including her testimony regarding side effects of her medication.  See R. 25 ("She has side effects of dozing off and sleeping a lot and increased

---

[6] Colbert cites to SSR 16-3p, but that opinion was not effective until after the ALJ issued his ruling.  See SSR 16-3p, 2016 WL 1237954, at *1 (S.S.A. Mar. 24, 2016) ("This SSR is effective on March 28, 2016.").  The SSR in effect at the time of the ruling was SSR 96-7p.

appetite. However, she stated that the medication helps her because she does not hear the voices she was hearing as much."). While in finding Colbert's testimony not "entirely supported by the evidence of record as a whole," R. 26, the ALJ did not explicitly address the side effects of Colbert's medications, there is ample evidence in the opinion and the record to "glean the rationale of the ALJ's decision." Mongeur, 722 F.2d at 1040. Notably, during the ALJ's summary of the record evidence, he noted numerous statements that contradicted or undermined Colbert's statements about the side effects of her medication. See R. 25-32. For instance, while she attributed her drowsiness to her medicine, she also reported to Dr. Fujiwaki in April 2014 that she had difficulty falling and staying asleep at night. R. 29. She had also reported on her function report that she did not "sleep at night" and that she takes Trazadone to "help [her] sleep." R. 256. Indeed, one medical source statement that directly addressed the side effects of medication, including drowsiness, stated that she had none, see R. 712, while her treating psychiatrist did not note any side effects on the medical source statement that he completed, see R. 700. Thus, there was sufficient evidence for the ALJ to have concluded that Colbert's assertions concerning the side effects of her medication were not entirely credible.

Colbert directs us to Arias v. Astrue, 2012 WL 6705873 (S.D.N.Y. Dec. 21, 2012), for the principle that an ALJ must consider all record evidence of side effects. Id. at *3. But the case is distinguishable because the ALJ in Arias ignored what the court characterized as "potentially significant factors" and omitted certain testimony "without explanation." Id. at *3-4. Here, in contrast, the ALJ noted Colbert's testimony and found it less than credible, a finding supported by substantial evidence in the record.

C. Consideration of Colbert's Wrist Impairment, Headaches, and Vision Problems

27

Colbert criticizes the ALJ's ruling because it allegedly failed to account for three particular ailments that, had they been considered, would have resulted in a finding that she was "disabled." Pl. Mem. at 16-17. Specifically, she contends that the RFC should have included limits on her pushing, pulling, reaching, handling, and fingering, and vision-related limitations, on account of alleged wrist impairments, severe headaches and blurry vision caused by a pseudo tumor, and glaucoma. Id.

In support of the pushing, pulling, and handling limitations, Colbert points to consulting examiner Dr. Vinod Thukral's 2014 opinion that Colbert had mild limitations in her ability to push or pull, R. 636, as well as Colbert's July 2015 diagnosis for tenosynovitis in her right wrist, R. 807, and treatment for a painful mass on her right wrist, R. 814. Pl. Mem. at 16. She also claims that despite treatment, her wrist did not improve. Id. (citing R. 807). We find, however, that there was substantial evidence supporting the Commissioner's decision to exclude any such limitations from her RFC.

First, Dr. Thukral's opinion stated that any recommended limitations were "due to [Colbert's] left knee pain," R. 636, and that Colbert had full range of motion in her wrists bilaterally, intact hand and finger dexterity, and full grip strength bilaterally, id. He also did not diagnose her as having any wrist problems or note such a concern. Id. Thus, the opinion does not support any limitations in pushing, pulling, reaching, handling, or fingering on account of a wrist impairment. Id. Instead, it supports the ALJ's RFC determination.

Second, Colbert has cited no record evidence connecting her July 2015 diagnosis for tenosynovitis to any ongoing functional limitations. The evidence that Colbert cites to merely notes that her tenosynovitis had not improved over a six month period, despite treatment with splints, anti-inflammatory medications, and general rest. R. 807, 812. The only other record

evidence addressing her wrist states that imaging shows "no fracture or dislocation . . . [,] minimal spurring at the first carpometacarpal joint . . . [and] mild soft tissue swelling at the dorsal aspect of the wrist." R. 867. A mere diagnosis, however, does not necessarily support a finding of limitations in a claimant's RFC. See, e.g., Aguilar v. Colvin, 2017 WL 1199726, at *7 (D. Conn. Mar. 31, 2017) (upholding RFC determination where plaintiff "cites only to the diagnoses of these conditions"); Trombley v. Colvin, 2016 WL 5394723, at *6 (N.D.N.Y. Sept. 27, 2016) (substantial evidence for ALJ decision that claimant's migraines not a severe impairment based on "a lack of medical evidence or other source opinions showing functional limitations [due to her migraines]"); Durgan v. Astrue, 2013 WL 1122568, at *3 (N.D.N.Y. Feb. 19, 2013) ("diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities.") (citing 20 C.F.R. § 404.1521(b)); see also Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order) ("mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability."). Moreover, Colbert did not mention her wrist during her testimony at the hearing, even though she was specifically asked about her limitations. R. 71-73, 79.[7] Absent such testimony, the ALJ could properly decline to attribute pushing, pulling, and handling limitations to Colbert associated with her wrist impairment. See Skardinski v. Colvin, 2017 WL 840401, at *8 (W.D.N.Y. Mar. 3, 2017) ("To the extent that the ALJ declined to expressly list Plaintiff's nonexertional limitations in the RFC finding, after concluding that such impairments had a negligible effect on Plaintiff's ability to work, the Court believes that such determination is

---

[7] Colbert's counsel had an opportunity to summarize her disabling conditions and mentioned only her psychiatric diagnoses and her knee problems. R. 60-61.

supported by substantial evidence."); Trombley, 2016 WL 5394723, at *17 ("While the ALJ may not have specifically mentioned non-severe impairments by name in his RFC analysis, the record as a whole shows that he did evaluate those impairments and their possible limiting effects and found those limitations to be non-existent or de minimis, thereby rendering any legal error on his part harmless."); May v. Colvin, 2014 WL 3546297, at *5 (W.D.N.Y. July 10, 2014) ("The Court finds the ALJ committed no legal error in determining that Plaintiff's abdominal pain was not a severe impairment since there was no medical evidence in the record that his abdominal pain resulted in functional limitations.").

As for her vision problems, Colbert notes that she was diagnosed with glaucoma, R. 662, 683, and a pseudo tumor that caused severe headaches and blurry vision, R. 363, 428, 498-500, but argues that the ALJ improperly failed to address her vision acuity in her RFC, see Pl. Mem. at 16. Colbert does not point to a medical opinion that suggests any vision limitations, however. Id. The only medical testing of her vision reported largely normal results: an April 2014 exam reported that she had with 20/20 vision in her right eye, 20/20 in her left eye, and 20/20 bilaterally on a standard vision test, R. 635; a December 2013 vision test at New York Eye and Ear Infirmary stated that she had 20/30 vision in her right eye and 20/25 vision in her left eye, R. 504; and May and August 2014 exams reported that she had glaucoma in her left eye, but did not note any resulting limitations, R. 666-74. Again, Colbert did not testify at the hearing that any such problems limited her ability to work. See R. 57-79; see also R. 276-77 (representative brief to ALJ). Accordingly, the ALJ did not err in omitting any discussion of vision problems resulting from either Colbert's glaucoma or pseudo tumor.

## IV. CONCLUSION

For the foregoing reasons, Colbert's motion for judgment on the pleadings (Docket # 14) is denied and the Commissioner's motion for judgment on the pleadings (Docket # 18) is granted.

SO ORDERED

Dated: New York, New York
June 19, 2018

GABRIEL W. GORENSTEIN
United States Magistrate Judge